UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDWARDS MOVING & RIGGING,
INC.,

       Plaintiff,

v.                                  Case No: 8:19-cv-1004-T-36SPF

CASEY JENKINS, SIMS CRANE &
EQUIPMENT CO., and SIMS HD,
LLC,

       Defendants.
_____/

## OPINION AND ORDER

    This cause came before the Court during a bench trial held on June 2, 2020, June 3, 2020, and July 14, 2020. Upon due consideration of the testimony, exhibits received into evidence, argument of counsel, and the applicable law, and being otherwise fully advised in the premises, the following constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I.    FINDINGS OF FACT

### A. Edwards and Its Employment of Jenkins

---

[1] Throughout this Opinion and Order, the Court may adopt, without attribution, language proposed by one party to the action. In all such instances, the findings or conclusions in question have become those of the Court, based on the Court's review of the evidence and the law. To the extent that any of the Court's findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.

1.      Edwards Moving & Rigging, Inc. ("Edwards") is a Kentucky corporation with its principal place of business in Shelbyville, Kentucky.[2]

2.      Casey Jenkins ("Jenkins") is a Florida citizen and resident.[3]

3.      Sims Crane & Equipment Co. ("Sims Crane") is a Florida corporation with its principal place of business in Florida.[4] Sims HD, LLC ("Sims HD" and, together with Jenkins and Sims Crane, "Defendants") is a Florida limited liability company, whose member is a Florida citizen.[5]

4.      Edwards is involved in the heavy hauling, lifting, and rigging business.[6] The company moves and lifts heavy, long, or "overdimenisional" objects from "point A to point B," with these distances ranging from a couple inches to thousands of miles.[7] Edwards provides services across multiple industries, such as the power plant and energy, chemical manufacturing, and infrastructure industries.[8] Edwards competes across multiple markets nationwide, in almost thirty states, including in Florida.[9] Edwards identifies Florida as one of its market areas because it performs work in Florida and has a yard in Florida.[10] Edwards did not have any confidentiality agreements with customers that required Edwards to keep its customer relationships

---

[2] *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *See id.*
[7] *Testimony of Jennifer Schuster*, Doc. 100 at 24:14–17; *Testimony of Jason Edwards*, Doc. 100 at 85:7–25.
[8] *Testimony of Jennifer Schuster*, Doc. 100 at 24:18–25, 25:1–8.
[9] *Id.* at 45:5–7, 77:18–25, 78:1–23.
[10] *Id.* at 45:5–7.

confidential, nor did Edwards formally require any customer to agree to keep a bid for work confidential.[11]

5.      Jenkins asked Jennifer Schuster, his sister-in-law and executive vice president of Edwards, for a job at Edwards because he was unhappy with his sales position in paper products and janitorial supplies, and Ms. Schuster helped him get hired.[12] Edwards hired Jenkins as a regional sales manager in August of 2016.[13] Although he had experience in sales, Jenkins had no experience in the specialized heavy lifting, moving, and rigging industry before he worked for Edwards.[14] Substantially all of the knowledge and relationships that he developed in the specialized field in which Edwards operates and competes were developed through, and as a result of, his employment with Edwards.[15] It typically takes an inexperienced salesman between two and three years of both formal and informal on-the-job training to acquire the requisite knowledge and skills to be able to perform the job effectively and on his or her own at Edwards.[16]

6.      Jason Edwards, president of Edwards, Carlos Stolzenbach of Edwards, and Ms. Schuster each testified as to the extensive array of knowledge that an

---

[11] *Testimony of Casey Jenkins*, Doc. 115 at 9:9–16.

[12] *Testimony of Jennifer Schuster*, Doc. 100 at 23:18–20, 33:16–25, 34:1–4; *Testimony of Casey Jenkins*, Doc. 115 at 17:25, 18:1.

[13] *Testimony of Jennifer Schuster*, Doc. 100 at 33:24–25; *Testimony of Casey Jenkins*, Doc. 115 at 7:25, 8:1–2; *Joint Final Pretrial Statement*, Doc. 80 ¶9.

[14] *Joint Final Pretrial Statement*, Doc. 80 ¶9.

[15] *See Testimony of Casey Jenkins*, Doc. 100 at 122:6–25, 123:1–24.

[16] *See Testimony of Jennifer Schuster*, Doc. 100 at 39:9–12, 44:15–23; *Testimony of Jason Edwards*, Doc. 100 at 89:23–25; *Testimony of Carlos Stolzenbach*, Doc. 101 at 48:5–8.

inexperienced salesman must acquire and the training that a salesperson must receive while in Edwards' employ, including: safety training; utility safety and on-site training, estimator training; specifications and capabilities of equipment; pricing; permitting requirements; and route surveys, including bridge and utility constraints, the need for bucket trucks, and law enforcement and traffic control.[17]

7.    Jenkins' revenue figures during his tenure at Edwards bear out the two-to-three year learning curve. During his first year at Edwards, which was only a partial year as a result of when he joined, he did not invoice any revenue.[18] However, during his second year, he invoiced approximately $580,000.[19] In 2018, his third and final full year of employment at Edwards, he invoiced $1,500,000.[20]

8.    As a condition of his employment, Jenkins entered into a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement (the "Agreement") with Edwards on August 29, 2016.[21] Jenkins signed the Agreement at the time Edwards hired him.[22] Although there were at least two occasions in recent years in which Edwards inadvertently failed to maintain a non-compete agreement with employees who subsequently departed from their employment with Edwards, Ms.

---

[17] *Testimony of Jennifer Schuster*, Doc. 100 at 35:21–25, 36:1–25, 37:1–25, 38:1–19, 39:3–8; *Testimony of Jason Edwards*, Doc. 100 at 84:6–7, 89:18–22; *Testimony of Carlos Stolzenbach*, Doc. 101 at 46:19–25, 47:1–23, 48:5–8. *See also* Doc. 113-2 at 1.
[18] *Testimony of Jennifer Schuster*, Doc. 100 at 39:13–16.
[19] *Id.* at 39:17–19.
[20] *Id.* at 39:20–23.
[21] Doc. 113-3 at 1.
[22] *Joint Final Pretrial Statement*, Doc. 80 ¶9.

Schuster testified that Edwards requires all of its employees to sign non-compete agreements.[23] The Agreement provides, in relevant part:

> **1.    Covenants Not to Solicit or Compete.**
>
> > **A. Non-Competition.** Employee agrees that while Employee is employed by Employer and during a period of two (2) years immediately following the termination of his employment with the Employer for any reason whatsoever, (the Term), he shall not, within Employer's market area, (the "Territory"), engage in any of the following activities:
> >
> > > (1) Directly or indirectly enter into the employ or render any service to or act in concert with any person, partnership, corporation or other entity engaged in rendering any service being conducted or rendered by Employer at the time of the termination . . . .[24]

9.     Jenkins worked for Edwards for two and one-half years, until April of 2019, as a regional sales manager.[25] Jenkins traveled to locations within Florida, such as Jacksonville, Miami, and Vero Beach, as well as New York, Pennsylvania, Georgia, South Carolina, and Texas.[26] During his time at Edwards, Jenkins prepared Edwards' bids for heavy haul projects, which on occasion involved exclusively the use of third-party companies' cranes for lifting or moving heavy objects.[27] Trial exhibits confirm that Jenkins developed specialized knowledge and heavy lifting know-how during his

---

[23] *Testimony of Jennifer Schuster*, Doc. 100 at 44:5–8, 63:2–25, 64:1–25, 65:1–25, 66:1–19; Doc. 87 at 91:2–25, 92:1–13.
[24] Doc. 113-3 at 1.
[25] *See Joint Final Pretrial Statement*, Doc. 80 ¶9.
[26] *Testimony of Casey Jenkins*, Doc. 115 at 8:14–20, 11:16–25.
[27] *Joint Final Pretrial Statement*, Doc. 80 ¶9.

tenure with Edwards.[28] Jenkins admitted that he "learned a lot" during his employment with Edwards.[29]

10.    When Edwards hired Jenkins, he lived in the Tampa Bay area and Edwards' nearest office was in Jacksonville, Florida.[30] Traveling was a "regular part" of his job with Edwards, as he traveled to locations both within and outside the southeastern United States.[31] Some of this travel required Jenkins to be away from his home for months at a time.[32] The travel required of Jenkins, who serves as the primary income earner for his family, while in Edwards' employ proved difficult on his relationships with his wife and children.[33]

11.    In 2018, Jenkins informed Edwards' management that these travel requirements were difficult on his family and that he was considering resigning from Edwards.[34] In response, Mark Edwards, chief executive officer of Edwards, persuaded Jenkins to stay with the company, advising him that the company would hire a project manager to provide assistance to Jenkins.[35] However, according to Jenkins, the situation did not improve.[36] Jenkins wanted a job that would allow him to "stay local in the Tampa Bay area."[37]

---

[28] *See, e.g.*, Docs. 113-2, 113-10. *See also Testimony of Casey Jenkins*, Doc. 100 at 153:7–13.
[29] *Testimony of Casey Jenkins*, Doc. 115 at 60:14–19.
[30] *Id.* at 5:15–23.
[31] *Id.* at 11:16–25, 12:1–2, 13:1–25, 14:1–13.
[32] *Id.* at 8:14–20, 12:3–8.
[33] *Id.* at 16:2–25, 17:1–4.
[34] *Id.* at 17:14–25, 18:1–17.
[35] *Id.*
[36] *Id.* at 19:7–22.
[37] *Id.* at 19:23–25, 20:1.

## B. Jenkins Resigns from Edwards

12.     In early 2019, J.R. Nutting, the senior manager of Sims HD at the time, recruited Jenkins because he was already in the industry and had a background in the industry.[38]

13.     In April of 2019, Jenkins advised Edwards that he intended to provide Edwards with his two weeks' notice and accept a position with Sims Crane.[39] Ms. Schuster, with whom Jenkins spoke first, informed Jenkins that Edwards considered Sims Crane a competitor and advised him that working for Sims Crane would violate the Agreement.[40] Ms. Schuster also viewed Sims Crane's website following this conversation to confirm her understanding of Sims Crane and thereafter reiterated to Jenkins that Sims Crane constituted a competitor of Edwards.[41] Jenkins claimed that, prior to her review of the website, Ms. Schuster expressed uncertainty of whether a conflict existed.[42] Regardless, Edwards communicated the perceived conflict to Jenkins. Edwards advised Jenkins that he could remain employed with Edwards until he found employment other than the job at Sims Crane, even if that process took several months.[43] Edwards sought to have an "open dialogue" with Jenkins, but he

---

[38] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 100:1–11; *Testimony of Casey Jenkins*, Doc. 100 at 116:25, 117:1–9.

[39] *Testimony of Jennifer Schuster*, Doc. 100 at 46:20–25, 47:1–4; *Testimony of Casey Jenkins*, Doc. 115 at 20:2–8. *See also* Doc. 113-4 at 1.

[40] *Testimony of Jennifer Schuster*, Doc. 100 at 47:5–8; *see Joint Final Pretrial Statement*, Doc. 80 ¶9.

[41] *Testimony of Jennifer Schuster*, Doc. 100 at 11–18; *Testimony of Casey Jenkins*, Doc. 115 at 20:9–20.

[42] *Testimony of Casey Jenkins*, Doc. 115 at 20:9–12.

[43] *Id.* at 48:1–10; *Testimony of Jason Edwards*, Doc. 100 at 91:18–25, 92:1–5.

was determined to leave.[44] Approximately one week later, Jenkins informed Jason Edwards that he would "rather take [his] chances [of being sued] and go with Sims."[45]

14.     Jenkins provided a copy of the Agreement to Mr. Nutting.[46] Mr. Nutting introduced Jenkins to Alan Fisk, chief executive officer of Sims Crane and Sims HD.[47] Mr. Nutting provided a copy of the Agreement to Mr. Fisk.[48] Mr. Fisk instructed Mr. Nutting to have Jenkins determine whether Edwards had a problem with Jenkins' intended employment with Sims Crane in light of the Agreement.[49] Jenkins falsely reported back that he had spoken with Edwards and that Edwards did not have an issue with his employment by Sims Crane.[50]

15.     Despite Edwards' warnings, Jenkins resigned from his employment with Edwards in April of 2019 to work as "project lead" at Sims Crane, which would remain his job title for some time.[51] The parties agree that Sims Crane's hiring of Jenkins was effective on April 22, 2019.[52] Jenkins testified that he did not retain Edwards' estimator tool or any of Edwards' documents or data upon resigning from Edwards.[53] However, as he figured that a reasonable probability existed of Edwards

---

[44] *Testimony of Jennifer Schuster*, Doc. 100 at 48:4–10.
[45] *Id.* at 48:11–17; *Testimony of Jason Edwards*, Doc. 100 at 92:15–25 (internal quotation marks omitted).
[46] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 99:14–23.
[47] *Id.* at 99:24–25; *Testimony of Alan Fisk*, Doc. 100 at 177:14–17.
[48] *Testimony of Alan Fisk*, Doc. 100 at 226:24–25, 227:1–2.
[49] *Id.* at 229:24–25, 230:1–5.
[50] *Id.* at 228:23–25, 229:1–3, 24–25, 230:1–15.
[51] *Testimony of Casey Jenkins*, Doc. 115 at 20:2–8; *Testimony of Casey Jenkins*, Doc. 100 at 147:9–13; *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[52] *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[53] *Testimony of Casey Jenkins*, Doc. 115 at 11:2–12.

suing him, Jenkins implemented a "factory reset" of his Edwards-issued smartphone, which contained text messages from Mr. Nutting, before he returned the device to Edwards.[54]

16.     Sims Crane hired Jenkins, despite its prior receipt of a copy of the Agreement.[55] Additionally, Sims Crane allowed Jenkins to start working, despite receipt of a cease-and-desist letter from Edwards, which Sims Crane received after Jenkins' false report about Edwards' perspective on whether Sims Crane's employment of Jenkins violated the Agreement, but before Jenkins actually started working for Sims Crane.[56]

17.     Jenkins' decision to leave Edwards to work for Sims Crane harmed Edwards because Edwards lost the time and the "know-how" that it had invested into training Jenkins.[57] Further, in the void created by Jenkins' departure, other regional sales personnel of Edwards were forced to devote their efforts to managing projects that Jenkins either quoted or "still had on the books."[58] Although Edwards promoted a project manager in Kentucky to replace Jenkins, Edwards relocated this individual and his wife to Florida and invested additional time in training him, as he lacked familiarity with quotes and estimates.[59]

---

[54] *Testimony of Casey Jenkins*, Doc. 100 at 144:2–25, 145:1–4.
[55] *See Testimony of Alan Fisk*, Doc. 100 at 227:17–25, 228:1–9, 16–25, 229:1–9, 230:6–10.
[56] *Id.* at 230:6–24; 253:24–25, 254:1–2; *Joint Final Pretrial Statement*, Doc. 80 ¶9; Doc. 113-5 at 1.
[57] *Testimony of Jennifer Schuster*, Doc. 100 at 55:24-25, 56:1–3.
[58] *Id.* at 56:1–7.
[59] *Id.* at 56:8–13.

18.     Jenkins' "project lead" title at Sims Crane changed once Mr. Fisk learned from his deposition, which was conducted several months into this action, that Jenkins held that title.[60] The offer letter to Jenkins from Sims Crane for the position, signed by Sims Crane's chief financial officer, referred to the position as "project lead" several times.[61] Mr. Fisk testified that he did not know how Jenkins received the "project lead" title, that this title did not exist at Sims Crane before Jenkins began his employment, and that no employee has held such title since.[62] Jenkins testified to his understanding that the word "project" referred to projects such as heavy lift jobs and "crane picks."[63]

19.     Sims Crane purportedly hired Jenkins to equip J.R. Nutting with the cost of the "crane piece" of bids for work by Sims HD, which serves as Edwards' undisputed competitor.[64] Jenkins and Mr. Fisk described Jenkins' role as "crane salesman" and testified that this role included Jenkins pricing quotes for third-party customers as well as Sims HD on Sims HD projects.[65] Some of these third-party customers are not involved in heavy hauling projects.[66] The reason for hiring Jenkins to quote cranes for Sims HD was that other salesmen, including Mr. Nutting of Sims HD, were not abiding by Sims Crane's rental rates.[67] Mr. Fisk admitted that Mr. Nutting, armed with the information on the "crane piece" provided by Jenkins, would

---

[60] *Testimony of Alan Fisk*, Doc. 100 at 240:8–14, 246:22–25, 247:1–6.
[61] *Id.* at 240:17–25, 241:1–8; Doc. 113-32 at 1–2.
[62] *Testimony of Alan Fisk*, Doc. 100 at 100:239:23–25, 240:1–14.
[63] *Testimony of Casey Jenkins*, Doc. 100 at 147:19–25.
[64] *Testimony of Alan Fisk*, Doc. 100 at 196:9–21; *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[65] *Testimony of Casey Jenkins*, Doc. 115 at 31:8–21; *Testimony of Alan Fisk*, Doc. 115 at 72:2–17.
[66] *Testimony of Casey Jenkins*, Doc. 115 at 32:13–16.
[67] *Testimony of Alan Fisk*, Doc. 115 at 72:2–17.

then go out and compete with Edwards in some cases.[68] At the time, Sims Crane employed approximately forty-two crane sales people who held the title of either salesman or crane application specialist.[69] None of Defendants' witnesses explained at trial why Sims Crane declined to assign any of those existing employees as a dedicated resource to Mr. Nutting.

20.     As discussed, Mr. Nutting, the only witness who was unaffiliated with any party at the time of trial, testified that he reached out to, and recruited, Jenkins because he was already in the industry and had a background in the industry. Mr. Nutting further testified that, during his recruitment of Jenkins, whether Jenkins would be working for Sims Crane or Sims HD was undetermined[70] One of Sims Crane's records for Jenkins' employment, which Mr. Nutting signed, indicated that Jenkins would be working in "Sims Crane Sales (under JR)."[71] Defendants do not dispute that "JR" represented Mr. Nutting.

21.     Jenkins entered into a non-compete agreement with Sims Crane when he was hired.[72] Like the Agreement, Sims Crane's non-compete agreement provides for a two-year term.[73] Sims Crane's non-compete agreement represents that the company "is engaged in the crane and equipment rental and rigging business."[74] Mr. Fisk

---

[68] *Testimony of Alan Fisk*, Doc. 100 at 196:22–25.
[69] *See Testimony of Alan Fisk*, Doc. 115 at 102:6–15.
[70] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 99:1–5.
[71] Doc. 113-32 at 1.
[72] *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[73] Doc. 113-28 at 1.
[74] *Id.*

admitted that Sims Crane's non-compete agreement would prohibit Jenkins from returning to work for Edwards.[75] Mr. Fisk also testified that the two-year duration of Sims Crane's non-compete agreement constitutes a reasonable duration and that, just as Sims Crane maintains an interest in protecting information through its non-compete agreement, Edwards maintains the same interest in protecting information through the Agreement.[76]

22.     Jenkins testified that since leaving Edwards, he has not made any effort to solicit or induce any Edwards employee to leave Edwards, he has not solicited any customer with whom he interacted while at Edwards for the purpose of "drum[ming] up some business" for Sims Crane or Sims HD, no person affiliated with Sims Crane or Sims HD has asked him to provide information about Edwards' business or Edwards' customers, and no person affiliated with Sims Crane or Sims HD has asked him whether he maintains any documents or information from Edwards to share.[77]

## C. Sims Crane and Its Services

23.     At trial, Mr. Fisk testified that Sims Crane and Edwards do not compete because Sims Crane is a crane rental company and Edwards does not rent cranes.[78]

24.     The parties do not dispute that Sims Crane rents cranes and heavy equipment.[79] Mr. Fisk explained that Sims Crane supplies cranes and heavy

---

[75] *Testimony of Alan Fisk*, Doc. 100 at 214:14–20.

[76] *Id.* at 217:10–12, 21–25, 218:1.

[77] *Testimony of Casey Jenkins*, Doc. 115 at 27:19–25, 28:1–3, 10–25, 29:1–8.

[78] *Testimony of Alan Fisk*, Doc. 100 at 180:10–16.

[79] *Joint Final Pretrial Statement*, Doc. 80 ¶9.

equipment in Florida: in approximately 20% of its jobs, a customer will rent the crane or heavy equipment from Sims Crane and do with it what he or she will, whereas in approximately 80% of its jobs, Sims Crane will furnish the crane and the operator who uses the crane to "lift and move objects of all different sizes" for customers.[80]

25.     Mr. Fisk acknowledged that the nature of the business of Sims Crane, by necessity, includes lifting heavy or oversized objects or equipment.[81]Another service that Sims Crane provides for customers is to haul large, heavy objects with equipment other than cranes.[82] Indeed, plenty of heavy hauling projects do not require the use of a crane.[83] Sims Crane has hauled concrete poles for Florida Power & Light.[84] There have been occasions where Sims Crane has lifted a piece of equipment and moved that piece of equipment from "location A to location B for a customer, one side of a plant over to the another side of a plant."[85] Sims Crane's moving services involve transportation within a job site or from one of its locations to elsewhere.[86]

26.     Although Edwards does not own cranes, it has performed lifting and moving jobs by using lifting equipment other than cranes, such as gantries or jack-and-slides, or by renting cranes to provide services under a turn-key approach.[87] If Edwards

---

[80] *Testimony of Alan Fisk*, Doc. 100 at 181:7–16, 181:25, 182:1–7; Doc. 113-37 ¶3 (describing Sims Crane as "the largest Florida-based crane rental company in the state").
[81] *Testimony of Alan Fisk*, Doc. 100 at 198:15–18.
[82] *Id.* at 184:21–24; *Testimony of Alan Fisk*, Doc. 115 at 83:24–25, 84:1–7.
[83] *Testimony of Casey Jenkins*, Doc. 15 at 23:1–7.
[84] *Testimony of Alan Fisk*, Doc. 115 at 83:24–25, 84:1–7.
[85] *Id.* at 85:14–20.
[86] *Id.* at 86:9–24.
[87] *Testimony of Jennifer Schuster*, Doc. 100 at 75:1–22; *Testimony of Jason Edwards*, Doc. 100 at 100:7–23.

wants to use a crane, it must contract with a third-party crane company to use that company's crane and then Edwards will pass the cost along to the customer.[88] During his time at Edwards, Jenkins contacted third-party crane companies to rent cranes for Edwards projects.[89] On at least one occasion, Jenkins informed a customer that the customer could rent its own crane and that Edwards typically "mark[s] [its] cost up 30 percent" when it supplies a crane.[90] Further, Ms. Schuster expressed uncertainty about whether Edwards employs any individual who knows how to operate a crane, and Jenkins was unaware of any crane operators employed by Edwards.[91] On the other hand, Sims Crane employs approximately 300 individuals in the positions of crane operators, apprentices, and oilers.[92]

27.    While still at Edwards, Jenkins prepared bids on projects that exclusively or substantially involved the use of cranes.[93]

28.    In referencing the e-mail in which he advised that Edwards marked up crane cost by 30% and that there were "several crane companies in the area that would be more competitive," including "Sims," Jenkins admitted during trial that price is only one variable for determining competitiveness, with other factors including

---

[88] *Testimony of Jason Edwards*, Doc. 100 at 97:9–11, 98:11–14.
[89] *Testimony of Casey Jenkins*, Doc. 115 at 23:1–25, 24:1–25, 25:1–12; Docs. 114-9 at 1; 114-10 at 1; 114-11 at 1; 114-12 at 1.
[90] *Testimony of Casey Jenkins*, Doc. 115 at 26:2–14; Doc. 114-1 at 1.
[91] *Testimony of Jennifer Schuster*, Doc. 100 at 68:5–13; *Testimony of Casey Jenkins*, Doc. 115 at 22:13–25.
[92] *Testimony of Alan Fisk*, Doc. 100 at 206:4–9.
[93] Docs. 113-14 at 1; 113-15 at 1–2; 113-16 at 1–2.

reliability, safety record, and timeliness.[94] Indeed, in an e-mail addressed to Jenkins prior to this litigation, Edwards acknowledged Sims Crane as a competitor and noted their "aggressive approach."[95] Another internal Edwards e-mail sent to Jenkins and other Edwards personnel described "Sims" as a "direct competitor."[96] Jenkins did not dispute or otherwise seek to clarify the contents of either e-mail at the time.[97]

29.    As discussed, there have been instances in which Sims Crane lifted a piece of equipment for a customer and moved that piece of equipment from one location to another within the confines of a jobsite.[98] Thus, there is some transporting done by Sims Crane within the ordinary course of its business.[99] Edwards also transports heavy, large, or oversized objects within a given jobsite, in addition to transporting such objects over the road: over 30% of Edwards' jobs involve moving objects within a jobsite, whereas less than 10% involve transporting objects to a destination hundreds of miles away.[100]

30.    Both Edwards and Sims Crane are members of the Crane and Rigging Division of the Specialized Carriers & Rigging Association, a trade association.[101]

31.    Edwards' Exhibit 42, which was admitted into evidence without objection, contains the statement of Victor Butler, identified as an employee of either

---

[94] *Testimony of Casey Jenkins*, Doc. 115 at 43:16–25, 1–9.
[95] Doc. 113-18 at 1.
[96] Doc. 113-17 at 1.
[97] *Testimony of Casey Jenkins*, Doc. 100 at 139:10–25, 140:1–25, 141:1–7.
[98] *Testimony of Alan Fisk*, Doc. 100 at 187:4–24.
[99] *Id.* at 187:25, 188:1–7.
[100] *Testimony of Jennifer Schuster*, Doc. 100 at 29:5–25, 30:1.
[101] *See id.* at 31:7–21.

Sims Crane or Sims HD, that Sims Crane "haul[s] transformers also" and has "three trailers" like the trailer depicted in the exhibit, which appears to be used to haul heavy objects over the road.[102]

32.     The homepage for Sims Crane's website, as presented during trial, provides that Sims Crane is "More than just Cranes" and advertises its services as "Specialized rigging & machinery moving services for most industrial applications."[103] Mr. Fisk agreed that this language could be used to describe some of the services performed by Edwards.[104] The homepage includes a photograph of, what appears to be, a Sims HD truck involved in a heavy haul project with no crane.[105] Similarly, Edwards' website, as presented during trial, provides, "No matter what your project requires, whether it's a short haul, specialized jacking or rigging, barge or rail transport, a complicated crane lift or a complete turnkey operation, Edwards can provide the services.[106]

33.     Mr. Fisk acknowledged that the nature of Sims Crane's business includes, by necessity, performing the following categories of services: (1) transporting heavy or oversized objects, machinery, or equipment for customers; (2) moving cranes in jobsites for customers; (3) lifting heavy or oversized objects or equipment (at least

---

[102] Doc. 113-42 at 1; *Testimony of Alan Fisk*, Doc. 115 at 109:3–22, 110:23–25, 111:1–25, 112:1–3.
[103] Doc. 113-19 at 1.
[104] *Testimony of Alan Fisk*, Doc. 100 at 210:1–25.
[105] Doc. 113-19 at 1; *Testimony of Casey Jenkins*, Doc. 100 at 142:5–7.
[106] Doc. 113-1 at 1.

some of which Sims Crane has performed for customers); and (4) rigging heavy or oversized objects, machinery, or equipment for customers.[107]

34.    The evidence demonstrates that at all times material to this action, Jenkins was directly employed by Sims Crane, which renders for customers at least the following services that Edwards also renders for customers: (1) lifting and moving large, heavy objects varying distances with cranes and with equipment other than cranes; (2) hauling large, heavy objects various distances with equipment other than cranes; and (3) rigging.

**D. Services Provided by Jenkins to Mr. Nutting and Sims HD**

35.    Sims HD was founded as a heavy duty rigging and machinery moving company to provide "experienced handlers, planning experts, and other mechanical staff as the solution to industrial equipment moving needs."[108] Sims HD is proficient in the removal, transportation, and placement of heavy-duty industrial equipment and machinery in various facilities, such as hospitals, radiology centers, power plants, recycling centers, and more, throughout Florida.[109] The parties do not dispute that Edwards and Sims HD are competitors in the heavy hauling, lifting, and rigging business in Florida.[110]

---

[107] *Testimony of Alan Fisk*, Doc. 100 at 198:3–25, 199:1–5, 206:20–25, 207:1–4; *Testimony of Alan Fisk*, Doc. 115 at 85:14–20.
[108] *Joint Final Pretrial Statement*, Doc. 80 ¶9.
[109] *Id.*
[110] *Id.*

36.     Mr. Nutting testified that he held exclusive responsibility for determining the pricing for all Sims HD quotes and that he never asked Jenkins for his assistance in determining the pricing of a Sims HD quote or for Jenkins' opinion about the pricing for a Sims HD quote.[111] However, Mr. Fisk admitted at trial that Jenkins rendered services to Mr. Nutting, the head of Sims HD, who was engaged in rendering services that Edwards was providing.[112] Indeed, while Sims Crane is Jenkins' nominal employer, Jenkins, Mr. Nutting, and Mr. Fisk admitted that Jenkins provided clerical and administrative services to Sims HD.[113] Mr. Nutting acknowledged that in the course of preparing quotes for Sims HD jobs, he sometimes asked Jenkins to type up the quotes.[114] Mr. Nutting testified that he would supply Jenkins with all the information needed to type up the Sims HD quotes.[115]Jenkins claimed he did not determine the pricing for these quotes.[116] According to Jenkins, Mr. Nutting would supply him with the request for quote, which included Mr. Nutting's notes and the quote developed by Mr. Nutting.[117] Jenkins would then pull up the NextGen system, the system with preloaded information that was used to "produce quotes in the system for Sims."[118] Mr. Nutting, who has a limited formal education, has never used the

---

[111] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 80:7–18, 83:1–6.

[112] *Testimony of Alan Fisk*, Doc. 100 at 224:24–25, 225:1–3.

[113] *Testimony of Casey Jenkins*, Doc. 100 at 113:9–21, 114:7–10; *Testimony of Alan Fisk*, Doc. 101 at 30:9–12; *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 96:2–4.

[114] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 81:3–5.

[115] *Id.* at 82:17–20.

[116] *Testimony of Casey Jenkins*, Doc. 115 at 34:21–25, 35:1–2.

[117] *Id.* at 33:10–23.

[118] *Id.* at 33:18–25, 34:1–4.

NextGen system.[119] In using this system, Jenkins had to "click the contact," edit the "job description," and click on the "estimate tab," which corresponded to the pricing provided by Mr. Nutting, and "change that number."[120] According to Jenkins, he has had no involvement, typing or otherwise, in preparing a Sims HD quote for any project on which he previously worked while employed at Edwards.[121]

37.    Mr. Fisk also acknowledged that all Sims employees try to help each other "across companies."[122] Sims employees are not restricted in the ways in which they are encouraged to help each other's companies.[123] Employees are expected to help each other because they are on "Team Sims."[124] And Mr. Fisk acknowledged that Jenkins assisted Mr. Nutting and that Sims HD benefitted from Jenkins working for Sims Crane in a manner that was no different than anyone else working at Sims Crane.[125]

38.    Although Edwards was not able to identify specific bids that it lost to Sims HD or Sims Crane as a result of Jenkins' move to Sims Crane or his assistance to Sims HD, the record demonstrates that Edwards and Sims HD bid on some of the same projects and had at least one customer in common.[126] For example, on April 16,

---

[119] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 81:19–20, 82:2–9.
[120] *Testimony of Casey Jenkins*, Doc. 115 at 34:5–16.
[121] *Id.* at 36:25, 37:1–6.
[122] *Testimony of Alan Fisk*, Doc. 101 at 35:1–8.
[123] *Id.* at 9:24–25, 10:1–2.
[124] *Testimony of Alan Fisk*, Doc. 100 at 232:24–25, 233:1.
[125] *Id.* at 9:16–25, 10:10–17.
[126] *Testimony of Jennifer Schuster*, Doc. 100 at 50:15–25, 51:1–25, 52:1; *Testimony of Alan Fisk*, Doc. 100 at 184:9–10; *Testimony of Carlos Stolzenbach*, Doc. 101 at 51:2–5.

2019, shortly before he resigned from Edwards, Jenkins prepared and sent quotes for Florida Power and Light sites to Fracht USA, a freight forwarder.[127] Each quote involved Edwards receiving, transporting, and setting a transformer.[128] The e-mail to the Fracht representative indicated that a quote for "FPL Mason" was attached to the e-mail.[129] On April 24, 2019, after Jenkins began working for Sims Crane, Mr. Nutting forwarded an e-mail to Jenkins regarding another freight forwarder's request for quotes for "12 transformers going to 12 FPL locations."[130] A quote attached to the e-mail provided for delivery and offloading of a transformer to "FPL Mason."[131] Jenkins claimed that Mr. Nutting prepared Sims HD's quote for this work.[132]

39.     Jenkins' role at Sims Crane regularly involved preparation of entire quotes exclusively for the services of Sims HD, not merely the rental of Sims Crane equipment.[133]

40.     Jenkins has prepared numerous Sims HD quotes for Mr. Nutting that involved no crane services.[134] Jenkins has also prepared Sims HD quotes for Mr. Nutting that were principally for Sims HD services with ancillary crane work or crane services.[135]

---

[127] Doc. 113-2 at 1; *Testimony of Casey Jenkins*, Doc. 100 at 167:5–9; *Testimony of Jennifer Schuster*, Doc. 100 at 40:9–20, 51:23–25, 52:1.
[128] Doc. 113-2 at 2–41.
[129] Doc. 113-2 at 1.
[130] Doc. 113-6 at 1–2.
[131] *Id.* at 4.
[132] *Testimony of Casey Jenkins*, Doc. 100 at 167:13–15.
[133] *See, e.g.*, Docs. 113-23 at 1–4; 113-24 at 1–5; 113-26 at 1–5; 113-40 at 1–6.
[134] Docs. 113-23 at 1–2; 113-26 at 1–4.
[135] Doc. 113-41 at 1, 3.

41.     The evidence demonstrates that Jenkins has provided at least the following additional services to Sims HD, and acted in concert with Sims HD, while putatively employed by Sims Crane: (1) communicating with third parties, such as law enforcement and permitting authorities, regarding Sims HD projects;[136] (2) providing substantive input about logistical and technical aspects of projects;[137] (3) securing engineering drawings necessary to obtain permits to haul heavy, oversized loads over the road;[138] and (4) preparing Sims HD sales materials, including the documents that Sims HD customers would sign to hire Sims HD to perform services that Edwards performs.[139] In some of these communications, Jenkins used the pronoun "we" to refer collectively to himself and Sims HD.[140]

42.     In light of this evidence, it is clear, with reference to the terms of the Agreement, that: (1) Jenkins rendered a variety of services to, and acted in concert with, Sims HD; and (2) Sims HD engaged in rendering services that Edwards rendered at all times material to this action.

### E. Relationship of Sims Crane and Sims HD, Their Employees, and Jenkins

43.     Sims Crane and Sims HD maintain separate financial statements, bank accounts, insurance policies, rosters of employees, and equipment.[141] The revenue of

---

[136] Doc. 113-12 at 1–2; *Testimony of Casey Jenkins*, Doc. 100 at 157:2–18.
[137] Docs. 113-7 at 1; 113-8 at 1; 113-11; *Testimony of Casey Jenkins*, Doc. 100 at 153:7–13.
[138] Doc. 113-10 at 1–5. *See also* Doc. 113-111 at 1.
[139] *Testimony of Alan Fisk*, Doc. 101 at 18:11–25, 19:1–25, 20:1–25, 21:1–19, 24:17–25, 25:1–3; Doc. 113-22 at 1–4; *see generally* Doc. 113-20.
[140] *Testimony of Casey Jenkins*, Doc. 100 at 151:25, 152:1–25, 153:1–2, 154:14–25; *Testimony of Casey Jenkins*, Doc. 115 at 46:10–16; Docs. 113-10 at 1; 113-11 at 1; 113-12 at 1.
[141] *Testimony of Alan Fisk*, Doc. 115 at 66:25, 67:1–5, 21–25, 68:1.

Sims HD is between approximately 2% and 3% of Sims Crane's revenue.[142] The companies presently do not occupy the same business location, but they shared the same principal place of business address when Sims Crane hired Jenkins in 2019.[143] Sims Crane charges Sims HD a monthly management fee for providing book-keeping and general management.[144] Sims Crane, Sims HD, and other affiliated companies reciprocally invoice one another for equipment leased between one and another and for services provided from one to another.[145] Nonetheless, the companies have the same chief executive officer and chief financial officer.[146] All four of Sims HD's officers or directors are officers or directors of Sims Crane, which has additional officers and directors.[147] The companies are frequently referred to, in company parlance, as "Team Sims."[148] Mr. Fisk likewise referred to the companies as the "Sims family of companies."[149] Sims HD has between 100 and 200 customers, many of which are also customers of Sims Crane.[150]

44.     Sims Crane and Sims HD regularly work in tandem on projects, and Jenkins was hired to provide certain assistance to Mr. Nutting on Sims HD projects.[151]

---

[142] *Id.* at 64:21–24.
[143] *Id.* at 66:25, 67:1–8, 89:7–19.
[144] *Id.* at 67:10–17.
[145] *Id.* at 68:7–25, 69:1–22; *see generally* Docs. 114-18; 114-19.
[146] Docs. 114-2 at 1–4; 114-3 at 1–4.
[147] Docs. 114-2 at 1–4; 114-3 at 1–4.
[148] *Testimony of Casey Jenkins*, Doc. 100 at 165:25, 166:1–5; *Testimony of Alan Fisk*, Doc. 100 at 232:24–25, 233:1; *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 86:22–25, 87:1.
[149] *Testimony of Alan Fisk*, Doc. 100 at 199:18–21.
[150] *Testimony of Alan Fisk*, Doc. 115 at 70:6–14.
[151] *Testimony of Alan Fisk*, Doc. 100 at 196:9–21.

All Sims employees try to help each other "across companies" and Mr. Fisk acknowledged an expectation for employees to help each other because they are on "Team Sims."[152] Indeed, Mr. Fisk acknowledged that providing assistance to "help related companies" as part of the job of each Sims employee.[153] Sims HD even pays Sims Crane to provide administrative services to Sims HD.[154]

45.     Sims HD was created as a "heavy haul company" in 2014 because Sims Crane had "miss[ed] a lot of crane work by not being in the heavy ha[u]l business."[155] Mr. Nutting acknowledged one job bid on by Sims HD that could have easily been bid on by Sims Crane.[156] Multiple persons purportedly employed by Sims HD, including Mr. Nutting, have held themselves out to the public as employees of Sims Crane.[157] Mr. Nutting maintained both a Sims Crane e-mail address and a Sims HD e-mail address.[158]

46.     As discussed, Jenkins provided services to Sims HD. The services provided by Jenkins are not excluded from the arrangement in which Sims HD pays

---

[152] *Id.* at 232:16–25, 233:1; *Testimony of Alan Fisk*, Doc. 101 at 35:1–8.
[153] *Testimony of Alan Fisk*, Doc. 115 at 116:7–17.
[154] *Id.* at 116:14–17.
[155] *Id.* at 64:14–20.
[156] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 91:7–18.
[157] *Testimony of Alan Fisk*, Doc. 100 at 238:10–25, 239:1–9; *Testimony of Alan Fisk*, Doc. 115 at 93:13–22. *See also Testimony of Alan Fisk*, Doc. 115 at 99:23–25, 100:1–7, 109:3–12.
[158] *Testimony of Alan Fisk*, Doc. 100 at 239:10–14; *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 87:8–10.

Sims Crane a monthly fee for administrative services performed by Sims Crane personnel.[159]

47.    Therefore, with reference to the language of the Agreement, the Court finds that Sims HD indirectly employs Jenkins. However, despite any similarities between the companies or actions of employees, the Court declines to find that Sims HD and Sims Crane are so intertwined that the companies constitute a single employer.

## F. Preliminary Injunction and Defendants' Submitted Declarations

48.    On July 31, 2019, the Court granted Edwards a preliminary injunction (the "Preliminary Injunction").[160] Finding that Sims HD, but not Sims Crane, constituted a competitor of Edwards, the Court: (1) enjoined Jenkins from working for Sims HD through and including April 17, 2021; (2) enjoined Sims HD from employing Jenkins through and including April 17, 2021; and (3) enjoined Jenkins from "assisting [Sims HD] in the business of transporting, moving, and lifting oversized components and equipment, including the bidding or quoting process or providing logistical support, through and including April 17, 2021," but this enjoinment did not prohibit Jenkins from "bidding or quoting [Sims Crane's] rental equipment to [Sims HD] or its customers or providing logistical support for hauling" Sims Crane's rental cranes or equipment.[161]

---

[159] *Testimony of Alan Fisk*, Doc. 100 at 219:16–25, 220:1–25, 221:1, 23–25, 222:1–9, 24–25, 223:1–6.
[160] Doc. 38 at 12–13.
[161] *Id.*

49.     Mr. Nutting did not read the Preliminary Injunction.[162] Likewise, whether Jenkins read the Preliminary Injunction is not evident from the record. Mr. Fisk admonished Jenkins and Mr. Nutting to be "very careful," but did not review the terms of the Preliminary Injunction with them or have a discussion about anything specific that Jenkins should or should not do in his employment with Sims Crane to benefit Sims HD.[163] Although Jenkins and Mr. Nutting represented to Mr. Fisk that they were being careful, Mr. Fisk did not ask them about the work that Jenkins was performing for Sims Crane for the benefit of Sims HD.[164] Mr. Fisk testified that Jenkins' work for Mr. Nutting created a "false impression of what was going on," meaning that "it would appear that [Jenkins] was quoting Sims HD customers, preparing quotes and even preparing the amounts" of such quotes.[165] Jenkins did not alter his activities in any way as a result of the Preliminary Injunction, nor did his job responsibilities change.[166] Mr. Fisk testified that, once he later learned that Jenkins was providing assistance to Nutting, he deactivated Jenkins' access to the NextGen quoting system.[167]

50.     To support its finding in the Preliminary Injunction that Sims Crane was not a competitor of Edwards, the Court relied upon Mr. Fisk's representations in his

---

[162] *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 101:3–6.
[163] *Testimony of Alan Fisk*, Doc. 101 at 6:14–25, 7:1–3, 21–25; *Testimony of Alan Fisk*, Doc. 115 at 74:12–18.
[164] *Testimony of Alan Fisk*, Doc. 101 at 7:4–6, 11–20, 8:1–3.
[165] *Id.* at 8:4–11; *Testimony of Alan Fisk*, Doc. 115 at 73:4–15.
[166] *Testimony of Casey Jenkins*, Doc. 100 at 111:18–25, 112:1–3, 173:7–25, 174:13–25, 175:1–2; *Testimony of Jeffrey Robert Nutting*, Doc. 101 at 101:7–10.
[167] *Testimony of Alan Fisk*, Doc. 115 at 74:21–25, 75:1–25.

declaration that Sims Crane was a "crane rental company" and engaged in "supply[ing] cranes and heavy equipment throughout Florida."[168] During the Preliminary Injunction proceedings, Defendants did not advise the Court about the other services that Sims Crane renders, as provided above.[169]

51.     In reviewing the purported distinctions between Sims Crane and Sims HD, the Court also relied on Mr. Fisk's representations in his declaration that Sims Crane had hired Jenkins to (1) "quote crane rental services to existing Sims Crane customers who utilize Sims HD's hauling services"; and (2) "provide logistical support for the crane rental and hauling services, such as local permitting, routing determinations, and transportation support where necessary."[170] Mr. Fisk further averred that Jenkins "was hired to assist Mr. Nutting on the crane rental quoting for projects where heavy hauling was ancillary to crane rental services."[171] However, the additional evidence discussed above contradicts Mr. Fisk's declaration. Documentary evidence demonstrates that, before and after the issuance of the preliminary injunction, Jenkins did far more than merely quoting crane rentals for jobs where heavy hauling was "ancillary" to crane rental services.

52.     In his declaration, Mr. Fisk advised that Jenkins had not, and would not, "be bidding or quoting prices for hauling services."[172] But, the record contains

---

[168] Docs. 113-37 ¶3; 38 at 6.
[169] *See Testimony of Alan Fisk*, Doc. 100 at 194:2–25, 195:1–9, 205:12–21, 254:18–25, 255:1–13.
[170] Docs. 113-37 ¶8; 38 at 6 (internal quotation marks omitted).
[171] Doc. 113-37 ¶8.
[172] *Id.*

examples of Jenkins receiving information from Mr. Nutting so that he could prepare quotes for Sims HD. Mr. Fisk's declaration omitted any mention of Sims Crane furnishing cranes and the operators who use the cranes to lift and move objects.[173]

53.     Mr. Fisk admitted that reading the declaration was the only action he took to verify its truth, completeness, and accuracy.[174] He did not: (1) look at Jenkins' employment records, such as the offer letter received by Jenkins; (2) discuss with Jenkins the work he had been performing for Sims HD by that time; (3) discuss with Mr. Nutting the work that Jenkins had performed for him; or (4) review any e-mails between Jenkins and Mr. Nutting.[175]

54.     After evidence emerged in discovery, Edwards filed its Motion for Order to Show Cause, in which it argued that the Court should hold Defendants in contempt for violating the preliminary injunction.[176] Defendants submitted additional declarations of Jenkins and Mr. Nutting in response, which claimed that Jenkins' work for Sims HD was simply "clerical or administrative" and involved preparation of Sims HD quotes in which Sims HD services were "ancillary to a project involving the use of Sims Crane's cranes and equipment."[177] These statements were later undermined by the testimony of Jenkins and Mr. Nutting. Indeed, Jenkins admitted that he prepared numerous Sims HD quotes for Mr. Nutting that involved no crane services

---

[173] *Testimony of Alan Fisk*, Doc. 100 at 181:7–23, 182:5–10.
[174] *Id.* at 249:18–21.
[175] *Id.* at 251:9–20.
[176] Doc. 54 at 1.
[177] Docs. 60-1 ¶3; 60-2 ¶4.

whatsoever and, as set forth above, there are numerous examples of Jenkins preparing such quotes.[178]

55.     Despite Mr. Fisk's representations that Jenkins' role at Sims Crane was to "quot[e] rental services to existing Sims Crane customers who are also utilizing the hauling services of Sims HD," the trial record does not contain a single example of Jenkins providing such crane rental quotes on behalf of Sims Crane to Sims HD. Instead, the record contains numerous examples of Jenkins drafting quotes on behalf of Sims HD, not Sims Crane, to Sims HD customers.[179] The record demonstrates that Jenkins previously prepared a Sims HD quote to Sims Crane, his nominal employer.[180] The evidence at trial also demonstrated that Jenkins routinely provided services to Mr. Nutting and Sims HD that were related only to the work of Sims HD, not Sims Crane, that were separate and apart from Jenkins' quoting activities.

## II.     CONCLUSIONS OF LAW

56.     Edwards brings two claims in this action: (1) a claim for breach of contract against Jenkins; and (2) a claim for "tortious interference" against Sims Crane and Sims HD.[181]

57.     In its breach of contract claim against Jenkins, Edwards alleges that: (1) the Agreement constitutes a valid and enforceable contract; (2) Jenkins is in material

---

[178] *Testimony of Casey Jenkins*, Doc. 100 at 120:22–25, 121:1–2; Docs. 113-23 at 1–4; 113-24 at 1–5; 113-26 at 1–5.
[179] Docs. 113-23 at 1–4; 113-24 at 1–5; 113-26 at 1–5.
[180] Doc. 113-24 at 1–5.
[181] Doc. 1 ¶¶19–28.

breach of the Agreement because he works for "Sims," which renders services that Edwards renders in Florida and elsewhere; and (3) money damages are an inadequate remedy.[182] Edwards demands judgment specifically enforcing the Agreement and permanently enjoining Jenkins from continuing to breach the Agreement.[183]

58.     In its tortious interference claim, Edwards alleges that: (1) Sims Crane and Sims HD, upon receipt of the cease-and-deist letter, ignored the specific terms of the Agreement; (2) Sims Crane and Sims HD, by inducing Jenkins' breach, tortiously interfered with Edwards' contractual rights; (3) the unlawful conduct will cause Edwards to suffer "immediate and irreparable injury," which Edwards will continue to suffer, unless the Court immediately enjoins Defendants from such unlawful activities.[184]

59.     Edwards requests the following remedies: (1) a judgment of specific performance that directs Jenkins to cease his conduct in violation of the Agreement; (2) "[a]n injunction prohibiting Jenkins from working for Sims and prohibiting Sims from employing him"; (3) money damages, to the extent that such damages can be calculated; (4) an award of reasonable attorneys' fees and costs; and (5) any other relief deemed proper by the Court.[185]

60.     The Court has diversity jurisdiction over this action because the parties have diverse citizenship and the amount in controversy exceeds $75,000.

---

[182] *Id.* at ¶¶20, 22–23.
[183] *Id.* at ¶24.
[184] *Id.* at ¶¶26–28.
[185] *Id.* at 6–7.

## A. Breach of Contract

61.     The Agreement provides that Edwards and Jenkins "acknowledge and agree that this Agreement shall be construed under and governed by the laws of the Commonwealth of Kentucky, excluding its conflicts of law rules."[186] The parties to this action agree that Kentucky law governs enforcement of the Agreement.[187]

62.     Elements of breach of contract under Kentucky law require proof of the existence of a contract, breach of that contract, and that the breach caused damages.[188]

### 1.  The Covenant and the Agreement

63.     Preliminarily, it is undisputed that Edwards and Jenkins entered into the Agreement, which contained the covenant not to compete (the "Covenant").

64.     Defendants challenge the enforceability and reasonableness of the Covenant. Kentucky law recognizes restrictive covenants as valid and enforceable "if the terms are reasonable in light of the surrounding circumstances."[189] Indeed, restrictive covenants have been upheld where they are "reasonable in scope and in purpose."[190] As such, "reasonableness is the key to interpreting any noncompete agreement under Kentucky law."[191]

---

[186] Doc. 113-3 at 3.

[187] *Joint Final Pretrial Statement*, Doc. 80 ¶10.

[188] *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019).

[189] *Crowell v. Woodruff*, 245 S.W.2d 447, 449 (Ky. 1951).

[190] *Hall v. Willard & Woolsey, P.S.C.*, 471 S.W.2d 316, 317 (Ky. Ct. App. 1971).

[191] *Gardner Denver Drum LLC v. Goodier*, No. Civ.A. 3:06-CV-4-H, 2006 WL 1005161, at *4 (W.D. Ky. 2006)

65.    "[T]he test of reasonableness is whether the restraint, considering the particular situation and circumstances, is such only as to afford fair protection to the legitimate interests of the party in favor of whom it is given and not so extensive as to interfere with the interests of the public."[192] Further, "[r]easonableness is to be determined generally by the nature of the business or profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent."[193] The character of service to be performed and the relationship of the employee are also considerations.[194]

66.    First, the nature of the business and employment supports the reasonableness of the restraint. Mr. Stolzenbach testified that Edwards operates in a "specialized niche."[195] He identified six competitors in this business, including "Sims," all of which "chase the same jobs."[196] Edwards advertises both the recruitment and "ongoing training" of "highly skilled" individuals as allowing the company to maintain its "competitive edge."[197] Non-compete agreements are "common" in the

---

[192] *Stiles v. Reda*, 228 S.W.2d 455, 456 (Ky. Ct. App. 1950). *See also Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978) (emphasizing that an agreement restraining trade is reasonable if, when considering the nature of the business, the situation of parties, and the circumstances of the particular action, the restriction only affords fair protection to the coventee's interests and "is not so large as to interfere with the public interests or impose undue hardship on the party restricted").

[193] *Crowell*, 245 S.W.2d at 449. *See also Managed Healthcare Assocs., Inc. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000) ("Kentucky courts have also acknowledged that noncompetition clauses play a critical role in business and are favored as long as they reasonable in geographic scope and duration.").

[194] *Crowell*, 245 S.W.2d at 449.

[195] *Testimony of Carlos Stolzenbach*, Doc. 101 at 49:16–21. *See also* Doc. 113-1 (listing "specialized jacking or rigging" among Edwards' services).

[196] *Id.* at 49:12–21.

[197] Doc. 113-1 at 1.

industry as a result of the competition.[198] The record also demonstrates that Edwards and Sims HD bid on some of the same projects and had at least one customer in common.

67.     Against this backdrop, the parties do not dispute that Jenkins possessed no experience in the specialized heavy lifting, moving, and rigging industry prior to working for Edwards. Ms. Schuster and Mr. Edwards described the substantial knowledge and training that any inexperienced salesman, such as Jenkins, must acquire while in Edwards' employ, which spanned numerous topics, including utility safety and on-site training, specifications and capabilities of equipment, and route surveys. Two to three years are required just for an inexperienced salesman to gain this requisite knowledge and these skills so that he or she may perform the job effectively and on his or her own. Ms. Schuster testified that Edwards invests "time and energy" into training individuals, "introducing them to clients, helping them develop relationships, you know, the general know-how and goodwill that [Edwards has] created" throughout numerous years of business.[199] Thus, participation in the industry through the regional sales manager position required Jenkins to gain specialized knowledge, skills, and qualifications. Jenkins even admitted that he "learned a lot" during his time with Edwards.[200] The need for Edwards to invest time in training Jenkins' replacement, who was unfamiliar with quotes and estimates, further

---

[198] *Testimony of Jennifer Schuster*, Doc. 100 at 45:8–11.
[199] *Id.* at 32:13–21.
[200] *Testimony of Casey Jenkins*, Doc. 115 at 60:14–19.

underscores the required knowledge and skills in this specialized industry. All of these facts are also relevant to the Court's consideration of the services to be performed and the relationship of Jenkins.

68.     Edwards' substantial investment in Jenkins is also significant because, although "trade secrets and customer goodwill are among the most basic interests traditionally protected by a covenant not to compete," courts analyzing Kentucky law have "adopted a more expansive view of the interests that an employer may legitimately protect, including its substantial investment in an important employee . . . ."[201]

69.     Next, the two-year duration of the Covenant is also reasonable. Kentucky courts have enforced two-year and three-year non-compete agreements as reasonable.[202] One federal court has interpreted an agreement between Edwards and a former employee with a two-year covenant not to compete identical to the Covenant as reasonable in duration.[203] Two to three years are required for an inexperienced salesman, like Jenkins, to gain the necessary knowledge and skills to perform the job effectively and on his or her own. Jenkins was no exception to this learning curve, as his revenue figures corresponded to the learning curve. Thus, the two-to-three year investment that Edwards made in Jenkins—the same investment for any

---

[201] *Gardner Denver Drum LLC*, 2006 WL 1005161, at *9.
[202] *C. Adjustment Bureau, Inc. v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 686 (Ky. Ct. App. 1981); *Gardner Denver Drum LLC*, 2006 WL 1005161, at *8.
[203] *Edwards Moving & Rigging, Inc. v. Lack*, No. 2:14-cv-02100-JPM-tmp, 2015 WL 3891953, at *5 (W.D. Tenn. June 24, 2015) ("The clause at issue only has a duration of two years, which is a duration that has been consistently found reasonable by Kentucky courts.").

inexperienced salesman—supports the reasonableness of the two-year duration of the Covenant. By signing the Agreement, Jenkins both agreed that the covenants in the Agreement, taken as a whole, were reasonable in duration and expressly disclaimed any argument to the contrary.[204] Finally, while not dispositive in this analysis, the Court also notes that Mr. Fisk agreed that the two-year duration was reasonable.[205]

70. The geographic scope of the Covenant is also reasonable. Broad geographic scopes are not unreasonable *per se*.[206] Rather, a geographic scope must be "assessed in light of the relevant circumstances."[207] For example, in *Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, the Kentucky Court of Appeals examined a covenant not to compete that restricted an employee from competing with the former employer, either directly or indirectly, by being employed by, or owning a proprietary interest in, an entity that competed with the former employer.[208] In light of the prior employer's "highly specialized and competitive" business and the ability of clients to select a competitor "almost overnight," the court held that the covenant not to compete constituted a reasonable restriction.[209] It has also long been recognized that a territorial limit is reasonable where it is "confined to the territory in which the employer keeps his market or carries on his business."[210]

---

[204] Doc. 113-3 at 2.
[205] *Testimony of Alan Fisk*, Doc. 100 at 217:10–12.
[206] *Gardner Denver Drum LLC*, 2006 WL 1005161, at *8.
[207] *Id.*
[208] 622 S.W.2d at 683.
[209] *Id.* at 686.
[210] *Thomas W. Briggs Co. v. Mason*, 289 S.W. 295, 298 (Ky. Ct. App. 1926). *See also Hammons*, 567 S.W.2d at 315 (finding that a two-hundred mile restriction was not unreasonable when

71.    Here, the Covenant's geographic scope is limited to Edwards' "market area."[211] The testimony offered by Edwards demonstrates that it competes across multiple markets, in nearly thirty states, including Florida. Jenkins' employment with Edwards as regional sales manager underscores the company's expansive operations: Jenkins traveled throughout the United States to locations in Pennsylvania, New York, Georgia, South Carolina, Texas, and Florida. Edwards maintains offices or yards in Kentucky, Florida, Illinois, Indiana, Ohio, Pennsylvania, Tennessee, and South Carolina. Edwards identifies Florida as one of its market areas because it performs work in Florida and has a yard in Florida. As such, this geographic limit is limited to the territory in which Edwards keeps its market or carries on its business. Additionally, this "market area" language has previously been recognized as reasonable.[212] Finally, by signing the Agreement, Jenkins agreed that the Covenant was reasonable in scope and disclaimed any argument to the contrary.[213]

72.    Thus, the Covenant affords fair protection to Edwards' legitimate interests and is not so extensive as to interfere with the interests of the public. The

---

considering the nature of the insurance adjusting business, which "depend[ed] on a large surrounding area in which to sustain itself in business").

[211] Doc. 113-3 at 3.

[212] *Lack*, 2015 WL 3891953, at *5. *See also Edwards Moving & Rigging, Inc. v. W.O. Grubb Steel Erection, Inc.*. No. 3:12CV146-HEH, 2012 WL 1415632, at *5 (E.D. Va. Apr. 23, 2012) (finding a covenant not to compete identical to the covenant in this action was not unduly broad, assuming that the "market area" language was limited to the territory served by Edwards).

[213] Doc. 113-3 at 2.

Covenant is valid and enforceable. No other challenge has been made to the validity of the Agreement, and the Court finds that the Agreement is valid and enforceable.

73.     For the foregoing reasons, the Court concludes that (1) Jenkins and Edwards entered into the Agreement; (2) the Covenant is valid and enforceable; and (3) the Agreement is valid and enforceable.

## 2. Breach of the Agreement

74.     The Court also concludes that Jenkins has breached the Agreement by violating the Covenant.

75.     As set forth above, the Agreement prohibits Jenkins, during his employment with Edwards and during a period of two years immediately following the termination of his employment with Edwards, from "[d]irectly or indirectly" entering into the employ of any entity "engaged in rendering any service being conducted or rendered" by Edwards at the time of the termination.[214] The Agreement also prohibits Jenkins from "[d]irectly or indirectly" rendering any service to, or acting in concert with, any entity rendering any service conducted or rendered by Edwards at the time of the termination.[215]

76.     The evidence demonstrates that Jenkins breached the Agreement in separate and independent ways.

77.     First, Jenkins directly entered into the employ of Sims Crane, which engaged in rendering services that Edwards conducted or rendered at the time of the

---

[214] *Id.* at 1.
[215] *Id.*

termination of Jenkins' employment. Evidence and testimony produced during trial demonstrates that, at all times material to this action, Sims Crane rendered for customers the following services that Edwards also renders for customers: (1) lifting and moving large, heavy objects varying distances with cranes and with equipment other than cranes; (2) hauling large, heavy objects various distances with equipment other than cranes; and (3) rigging.

78.     Second, Jenkins rendered services to Sims HD, which rendered the same services as Edwards at the time of the termination of Jenkins' employment. Indeed, the parties do not dispute that Sims HD and Edwards compete against each other in the heavy hauling, lifting, and rigging business in Florida. Mr. Fisk admitted that Jenkins rendered services to Mr. Nutting, who served as the senior manager of Sims HD, which was engaged in rendering services that Edwards was providing. As discussed above, the evidence demonstrates that Jenkins prepared quotes exclusively for the services of Sims HD for Mr. Nutting. Jenkins has prepared Sims HD quotes that did not involve any crane services. The evidence also demonstrates that Jenkins has provided at least the following additional services to Sims HD: (1) communicating with third parties, such as law enforcement and permitting authorities, regarding Sims HD projects; (2) providing substantive input regarding logistical and technical aspects of projects; (3) securing engineering drawings necessary to obtain permits to haul heavy, oversized loads over the road; and (4) preparing Sims HD sales materials.

79.     Third, Jenkins acted in concert with Sims HD. For example, Jenkins reached out to Norfolk Southern because Mr. Nutting had asked him to determine

who operated that company, which was relevant to a quote that Mr. Nutting was preparing. In an email advising Mr. Nutting that he had "a call in to Norfolk Southern," Jenkins used the pronoun "we" to refer collectively to Sims HD and himself.[216] By way of another example, Jenkins contacted a deputy at Mr. Nutting's direction regarding "a job that [Mr. Nutting] had coming up."[217] In the e-mail to the deputy, Jenkins again utilized the pronoun "we" to refer collectively to himself and Sims HD.[218] Jenkins admitted that he wrote this e-mail on behalf of Mr. Nutting, who served as senior manager of Sims HD.

80.    Fourth, Jenkins indirectly entered into the employ of Sims HD. Edwards presented testimony that Sims employees try to assist each other "across companies" and are not restricted in the ways in which they are encouraged to help each other's companies.[219] Indeed, Mr. Fisk acknowledged that providing assistance to "help related companies" as part of the job of each Sims employee.[220] Mr. Fisk also explained that Jenkins assisted Mr. Nutting and Sims HD benefitted from Jenkins working for Sims Crane in a manner that was no different than any other Sims Crane employee. As discussed extensively, Jenkins prepared quotations for Sims HD services and even communicated with others regarding Sims HD projects, prepared Sims HD sales

---

[216] Doc. 113-11 at 1; *see Testimony of Casey Jenkins*, Doc. 100 at 151:25, 152:1–7.
[217] *Testimony of Casey Jenkins*, Doc. 100 at 115:6–19.
[218] Doc. 113-12 at 1; *See Testimony of Casey Jenkins*, Doc. 100 at 116:1–25, 117:1–2.
[219] *Testimony of Alan Fisk*, Doc. 101 at 35:1–8.
[220] *Testimony of Alan Fisk*, Doc. 115 at 116:7–17.

materials, secured requisite engineering drawings, and provided substantive input regarding logistical and technical aspects of projects.

81.     Therefore, based on the foregoing, the Court concludes that Jenkins is in breach of the Agreement.

### 3. Damages

82.     Edwards presented testimony describing the substantial knowledge and training that any inexperienced salesman must acquire while working for Edwards. A salesman working for Edwards gains the requisite skill and knowledge to perform effectively only after two or three years. Edwards invests "time and energy" in training individuals, making introductions to clients, and the development of relationships.[221] Ms. Schuster explained that hiring someone, especially someone like Jenkins who did not previously work in the industry, requires an investment by Edwards of a "significant amount of time" in that individual.[222] Indeed, Edwards promotes these individuals as "the face of the company," introduces them to others, and shows them "how to do things."[223] As a result of Jenkins' departure, Edwards lost all the time and "know-how" that it had invested into Jenkins and Edwards hired, relocated, and trained a replacement for Jenkins.

83.     Therefore, the Court concludes that Jenkins' breach of the Agreement caused damages. However, the amount of damages sustained by Edwards is

---

[221] *Testimony of Jennifer Schuster*, Doc. 100 at 32:13–21.
[222] *Id.* at 45:8–15.
[223] *Id.*

"incalculable."[224] Edwards alleges that money damages serve as an inadequate remedy. By signing the Agreement, Jenkins agreed that Edwards "may not be adequately compensated by damages" for Jenkins' breach of the Covenant.[225] The Court discusses the remedy afforded to Edwards for this claim below.

### B. Tortious Interference

84.     The parties agree that Florida law governs Edwards' "tortious interference" claim.[226] Florida law recognizes a cause of action for tortious interference with a contract and cause of action for tortious interference with a business relationship, but "the only material difference appears to be that in one there is a contract and in the other there is only a business relationship."[227] As such, "[f]our elements are required to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference."[228]

85.     For the third element, "[a] third party intentionally interferes with a contract by 'influencing, inducing, or coercing one of the parties [to the contract] to . .

---

[224] *Id.* at 56:21–25.

[225] Doc. 113-3 at 2.

[226] *Joint Final Pretrial Statement*, Doc. 80 ¶10.

[227] *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).

[228] *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla. 5th DCA 2015) (citing *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)). *See also Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla., Inc.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002) (listing the elements of a claim "for tortious interference with a contract or business relationship").

. breach the contract."[229] Additionally, "[f]or the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship."[230]

86.     The parties do not dispute that Edwards employed Jenkins and that Jenkins signed the Agreement when Edwards hired him. Similarly, the record does not evidence any dispute that Sims Crane and Sims HD knew about the Agreement. Jenkins provided the Agreement to Mr. Nutting, and Mr. Fisk instructed Mr. Nutting to have Jenkins determine whether Edwards opposed Jenkins' intended employment with Sims Crane. Edwards' cease-and-desist letter, received by Jenkins, Sims Crane, and Sims HD prior to Sims Crane's effective hiring of Jenkins, further placed Defendants on notice of the Agreement.

87.     Sims Crane and Sims HD also intentionally and unjustifiably procured Jenkins' departure from Edwards for Sims Crane in breach of the Agreement. First, Sims Crane and Sims HD were strangers to the relationship between Edwards and Jenkins. Mr. Nutting expressly admitted that he recruited Jenkins while Jenkins worked at Edwards because Jenkins was already in the industry and had a background in the industry. Jenkins admitted that he received text messages from Mr. Nutting on his Edwards-issue smartphone, which he erased prior to leaving Edwards. Jenkins provided a copy of the Agreement to Mr. Nutting. After Mr. Fisk instructed Mr. Nutting to have Jenkins determine whether Edwards opposed Jenkins' intended

---

[229] *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1349 (M.D. Fla. 2019) (alterations in original) (quoting *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 5th DCA 1999)).
[230] *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999).

employment for Sims Crane, Jenkins lied. However, after Jenkins' misrepresentation, but before he began working for Sims Crane, Edwards sent the cease-and-desist letter to Jenkins, Sims Crane, and Sims HD. Nonetheless, Sims Crane proceeded with employing Jenkins. Indeed, Mr. Fisk testified that, although he was out of town when Sims Crane's April 22, 2019 offer letter to Jenkins was typed, he approved the hiring of Jenkins. Additionally, Mr. Fisk admitted that he could have informed Jenkins that Sims Cranes decided not to hire him after receipt of the cease-and-desist letter, but he did not do so.

88.     As a result of this interference, Jenkins resigned from Edwards and began working for Sims Crane in breach of the Agreement. The Court has previously outlined the damages caused to Edwards by Jenkins' breach.

89.     Edwards also claims that the attorneys' fees it has incurred in prosecuting this action may be appropriately awarded as tortious interference damages. The Agreement requires Jenkins to indemnify Edwards for "reasonable attorneys' fees and costs" that arise "out of any claim or suit resulting from" Jenkins' breach of the "covenants and his failure to perform a duty hereunder."[231] Edwards' entitlement to its reasonable attorneys' fees for its breach of contract claim is discussed below. For its tortious interference claim, however, Edwards relies on a line of cases analyzing the Wrongful Act Doctrine. "Florida follows the American Rule: a party may be awarded

---

[231] Doc. 113-3 at 2.

attorney's fees only when authorized under a statute or by agreement of the parties."[232]

In other words, "unless a statute or contract provides for attorneys' fees, a court may

not award them."[233] The "Wrongful Act Doctrine" constitutes a narrow exception to

the American Rule, whereby

> the wrongful act of the defendant has involved the claimant in
> litigation with others, and has placed the claimant in such
> relation with others as makes it necessary to incur expenses to
> protect its interests, such costs and expenses, including
> reasonable attorney's fees upon appropriate proof, may be
> recovered as an element of damages.[234]

90.    Courts applying the Wrongful Act Doctrine have recognized that the

doctrine applies "only when litigation ensuing from a party's wrongful act was against

a third party—not directly against the defendant."[235] Here, there was no litigation

against a third party: Edwards brings its tortious interference claim against Sims Crane

and Sims HD and, within the same action, a breach of contract claim against

Jenkins.[236] The cases cited by Edwards do not establish the applicability of this

doctrine. Thus, to the extent that Edwards relies on the Wrongful Act Doctrine for an

---

[232] *Grasso v. Grasso*, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015) (citing *Trytek v. Gale Indus. Inc.*, 3 So. 3d 1194, 1198 (Fla. 2009)).

[233] *MV Senior Mgmt, LLC v. Redus Fla. Housing, LLC*, __ So. 3d __, 2020 WL 6778008, at *1 (Fla. 1st DCA Nov. 18, 2020).

[234] *Grasso*, 131 F. Supp. 3d at 1309 (quoting *Schwartz v. Bloch*, 88 So. 3d 1068, 1071 (Fla. 4th DCA 2012)).

[235] *MV Senior Mgmt.*, 2020 WL 6778008, at *1.

[236] *See Grasso*, 131 F. Supp. at 1310 (finding the "third-party element" of the wrongful act doctrine to be satisfied where the plaintiff's daughter-in-law was a party to a prior state court action, but not the action before the Court). *See also Johnson Law Grp. v. Elimadebt USA, LLC*, No. 09-CV-81331, 2010 WL 2035284, at *8 (S.D. Fla. May 24, 2010) ("The wrongful act doctrine, however, only applies to the costs of litigation with third parties, not subsequent litigation with the defendants who committed the wrongful act.").

award of attorneys' fees, this reliance is misplaced. Further, Edwards has not submitted any authority in which courts analyzing a tortious interference claim under Florida law awarded attorneys' fees as damages under the claim.

### C. Permanent Injunction

91.     For its breach of contract claim, Edwards demands judgment specifically enforcing the Agreement and permanently enjoining Jenkins from continuing to breach. For its tortious interference claim, Edwards alleges that it has no other adequate remedy at law or other means to address its loss of "certain competitive advantages" and "injury to its goodwill and reputation," other than the Court enjoining Defendants.[237]

92.     A plaintiff who seeks a permanent injunction must demonstrate: "(1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[238] "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . . ."[239]

---

[237] Doc. 1 at 6.
[238] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).
[239] *Id.*

93.     "Harm is irreparable if an injury is not fully compensable by money damages or is difficult to calculate such that awarding damages is impracticable."[240] "[A]n injury is regarded as irreparable if there exists no certain pecuniary standard for the measurement of damages."[241] Further, loss of customer goodwill and unfair competition may amount to irreparable harm because these losses are difficult to calculate.[242]

94.     Here, Edwards has suffered an irreparable injury. Prior to joining Edwards, Jenkins had no experience in the specialized heavy lifting, moving, and rigging industry. While in Edwards' employ, Jenkins gained extensive knowledge regarding topics such as the specifications and capabilities of different types of equipment, permitting, and surveys. He also received training on numerous topics, including estimator training and safety training. Jenkins used this knowledge and training while in Edwards' employ, and his generated revenue increased during his

---

[240] *N. Harris Computer Corp. v. DSI Invest., LLC*, No. 1:19-CV-00142-GNS, 2019 WL 7546594, at *4 (W.D. Ky. Nov. 12, 2019) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). *See also Liza Danielle, Inc. v. Jamko, Inc.*, 408 So.2d 735, 738 (Fla. 3d DCA 1982) ("Irreparable injury is an injury of such a nature that it cannot be redressed in a court of law or, as the rule has been otherwise stated, the injury must be of a peculiar nature, so that compensation in money cannot atone for it.").

[241] *United Carbon Co. v. Ramsey*, 350 S.W.2d 454, 456 (Ky. Ct. App. 1961).

[242] *N. Harris Computer Corp.*, 2019 WL 7546594, at *4. *See also First Fin. Bank, Nat'l Assoc. v. Williams*, No. 5:19-CV-128-TBR, 2019 WL 4865888, at *4 (W.D. Ky. Oct. 2, 2019) ("Courts have consistently held that breach of a non-complete clause and loss of goodwill constitute irreparable injury."); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1337 (M.D. Fla. 2010) (stating that Florida law provides that the violation of an enforceable restrictive covenant creates a presumption that the person seeking enforcement of a restrictive covenant has suffered an irreparable injury).

employment. Mr. Nutting admitted that he recruited Jenkins because he was already in the industry—presence that resulted from his employment with Edwards—and had a background in the industry—background gained as a result of his employment with Edwards. Jenkins used this knowledge, training, and skill set to help Sims Crane and Sims HD in their provision of the same services provided by Edwards. Edwards hired, relocated, and trained a replacement for Jenkins following his departure. The harm suffered is irreparable. Indeed, Ms. Schuster testified that the loss of Jenkins, who gained "know-how" and the benefit of Edwards' substantial investment of time and training, to a competitor in the market is "incalculable."[243] Jenkins also agreed, by signing the Agreement, that Edwards "may not be adequately compensated by damages for a breach" of the Agreement and that Edwards would be entitled to "injunctive relief and specific performance," among other remedies.[244]

95.     Further, the balance of hardships weighs in Edwards' favor. As discussed, Jenkins' background in the industry, which he gained only as a result of his employment with Edwards, served as the basis for Mr. Nutting's recruitment of him. Edwards is qualified to work for competitors of Edwards only because of Edwards' investment in him. A defendant who voluntarily enters into a covenant not to compete and receives "substantial benefits from his employment . . . cannot now claim that the harm from enforcing the [c]ovenant he agreed to would be too great a hardship on

---

[243] *Testimony of Jennifer Schuster*, Doc. 100 at 56:21–25.
[244] Doc. 113-3 at 2.

him."[245] Any argument that current economic conditions weigh against an injunction is unpersuasive. Edwards notified Jenkins that it would seek to enforce the Covenant in April of 2019, before Jenkins began working for Sims Crane. Edwards even provided Jenkins with the opportunity to remain in its employ until he found employment other than the job at Sims Crane, but Jenkins rejected this offer, advising that he would "rather take [his] chances [of being sued] and go with Sims."[246] After Jenkins lied about Edwards' position regarding his employment with Sims Crane, Edwards further placed Defendants on notice of its position through the cease-and-desist letters. Nonetheless, despite Edwards' actions, Jenkins decided to work for Sims Crane. And despite any difficulty Jenkins faced as a result of his travel schedule while in Edwards' employ, such difficulty does not relieve Jenkins of his responsibilities under the Agreement.

96.     The entry of a permanent injunction does not disserve the public interest. There is a public interest in enforcing voluntarily assumed contract obligations.[247] Jenkins voluntarily entered into the Agreement. Denying enforcement of the Covenant to Edwards would contravene the public interest. As such, the entry of a permanent injunction does not disserve the public interest.

---

[245] *Gardner Denver Drum LLC*, 2006 WL 1005161, at *11.

[246] *Testimony of Jennifer Schuster*, Doc. 100 at 48:11–17; *Testimony of Jason Edwards*, Doc. 100 at 92:15–25 (internal quotation marks omitted).

[247] *Fruit of the Loom v. Zumwalt*, No. 1:15CV-131-JHM, 2015 WL 7779524, at *5 (W.D. Ky. Dec. 2, 2015). *See also New Horizons Computer Learning Ctrs., Inc. v. Silicon Valley Training Partners, Inc.*, No. 2:02CV459FTM29SPC, 2003 WL 23654790, at *8 (M.D. Fla. Nov. 12, 2003) ("Under Florida law, the public has an interest in the enforcement of restrictive covenants.").

97.     Therefore, based on the foregoing, the Court concludes that Jenkins must be enjoined from working in any capacity for Sims Crane or Sims HD. The Court also concludes that Sims HD and Sims Crane shall be enjoined from employing Jenkins in any capacity. In the Agreement, Edwards and Jenkins agreed that Edwards "may not be adequately compensated by damages for a breach by" Jenkins of the Covenant and, in such event, the two-year period of time within the Covenant "shall be deemed extended for a period equal to the respective period during which [Jenkins] is in breach thereof, in order to provide for injunctive relief and specific performance for a period equal to the full term thereof."[248] Thus, the injunction will be in effect until May 21, 2022, which is two years from the date of the Court's Order finding Defendants to be in civil contempt.  *See* docket entry 94.

### D. Attorneys' Fees

98.     The Agreement provides that Jenkins "shall indemnify and hold [Edwards] harmless from any . . . cost or expense (including reasonable attorneys' fees and expenses) arising out of any claim or suit resulting from [Jenkins'] breach of these covenants and his failure to perform a duty hereunder."[249] The Agreement is between Edwards and Jenkins only. Jenkins breached the Covenant and Edwards brought the breach of contract claim against him for his breach. Thus, Edwards is entitled to recover its reasonable attorneys' fees from Jenkins for its breach of contract claim.

---

[248] Doc. 113-3 at 2.
[249] *Id.*

99.     Edwards argues in its proposed findings of fact and conclusions of law that it incurred and paid "approximately $285,000" in legal fees in advance of trial.[250] Indeed, Ms. Schuster testified at trial that Edwards had "incurred attorney's fees of approximately $285,000."[251] Thus, this amount does not include any attorneys' fees incurred during or after trial. Edwards bases the corresponding rates on hourly rates previously provided, arguing that such rates are both reasonable and consistent with prevailing market rates for attorneys with comparable experience in business litigation. Additionally, the Court previously found that Edwards is entitled to its reasonable attorneys' fees incurred in prosecuting Defendants' violations of the Preliminary Injunction and ordered Defendants to pay to Edwards the attorneys' fees reasonably and necessarily incurred by Edwards in prosecuting Defendants' violations of the Preliminary Injunction.[252] The parties thereafter stipulated to "an amount of reasonable attorneys' fees as sought by Edwards in its Motion for Determination of Attorneys' Fees and Costs on Defendant[s]' Contempt," but asked the Court to "defer entering an order and judgment in that amount until the Court enters its order and judgment" on this action's merits.[253] Although Edwards represents in its proposed findings of fact and conclusions of law that the parties agreed to $30,000, the parties' stipulation does not specify an amount, nor does the record evidence the stipulated

---

[250] Doc. 117 at 30.
[251] *Testimony of Jennifer Schuster*, Doc. 100 at 56:14–17.
[252] Doc. 94 at 21.
[253] Doc. 109 at 1.

amount. Edwards vaguely represents that the $285,000 amount "includes fees incurred in connection with the contempt proceedings."[254]

100.   Although the Court concludes that Edwards is entitled to its reasonable attorneys' fees, the Court declines to award a specified amount of reasonable attorneys' fees to Edwards at this time. The amount sought by Edwards is incomplete, as it does not include those fees incurred during trial. Additionally, Defendants have not had an opportunity to respond to the amount sought by Edwards and, therefore, potential for agreement on the requested amount may exist. Clarification regarding the amount to which the parties stipulated for Edwards' prosecution of the violations of the Preliminary Injunction is also required. Therefore, Edwards shall move for a specified amount of reasonable attorneys' fees within the time provided below.

## III.   CONCLUSION

Accordingly, it is now **ORDERED**:

1.  Plaintiff Edwards Moving & Rigging, Inc. is entitled to judgment in its favor and against Defendant Casey Jenkins on Plaintiff's breach of contract claim (Count I);

2. Plaintiff Edwards Moving & Rigging, Inc. is entitled to judgment in its favor and against Defendants Sims Crane & Equipment Co. and Sims HD, LLC on Plaintiff's tortious interference claim (Count II);

---

[254] Doc. 117 at 31.

3. Defendant Casey Jenkins will be **ENJOINED** from working for Defendant Sims Crane & Equipment Co. or Defendant Sims HD, LLC, in any capacity through and including May 21, 2022;

4. Defendant Casey Jenkins will be **ENJOINED** from providing any services to, or acting in concert with, Defendant Sims Crane & Equipment Co. or Sims HD, LLC, or any person employed by either of those companies, in any capacity through and including May 21, 2022;

5. Defendant Sims Crane & Equipment Co. and Sims HD, LLC will be **ENJOINED** from employing Defendant Casey Jenkins in any capacity through and including May 21, 2022;

6. Defendant Casey Jenkins shall indemnify Plaintiff Edwards Moving & Rigging, Inc. for Plaintiff's reasonable attorneys' fees and expenses arising from Jenkins' breach of the Agreement. As provided in Rule 54(d), Fed. R. Civ. P., within **FOURTEEN (14) DAYS** of the date of the Judgment and Permanent Injunction, Plaintiff shall move the Court to award the amount of its reasonable attorneys' fees and expenses. To the extent that Defendant Jenkins opposes such relief, he shall respond within the time provided by the Local Rules.

7. A Final Judgment and Permanent Injunction will enter by separate order.

**DONE AND ORDERED** in Tampa, Florida on December 29, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any